UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UTOPIAN WIRELESS CORPORATION                    CIVIL ACTION

v.                                              NO. 21-444

ASSUMPTION HIGH SCHOOL, ET AL.                  SECTION "F"

ORDER AND REASONS

Before the Court is the defendants' motion to dismiss under Rule 12(b)(1) and 12(b)(6). For the reasons that follow, the motion is DENIED.

**Background**

This litigation arises from a dispute over the lease of an educational broadband service spectrum license. A telecommunications company seeks specific performance of a long-term Educational Broadband Service Lease Agreement and damages for its breach.

Radio frequencies are regulated by the Federal Communications Commission, which allocates them through the issuance of a spectrum license, which authorizes a licensee to use a specific portion of the electromagnetic spectrum, or to use a given frequency band within a given geographic area. Spectrum licensees may enter into individual use or lease agreements with third parties to authorize

1

the third party's use of all or part of the license holder's radio spectrum for commercial purposes.

Taking as true the complaint's allegations, educational broadband service spectrum licenses are valuable rights regulated by the Federal Communications Commission. As alleged in the complaint, to regulate the use of radio frequencies, the FCC issues licenses that authorize a licensee to transmit on specific frequencies or ranges of frequencies in particular geographic areas. The licenses are called "spectrum licenses" because they authorize the licensee to utilize a portion of the electromagnetic spectrum. Through different licenses, the FCC imposes different restrictions on the manner in which a licensee can use licensed spectrum; for example, the FCC permits licensees to use certain frequencies for FM radio transmission, cellular telephone transmission, television transmission, or air traffic control transmission.

Educational Broadband Service (EBS) is a kind of spectrum license.[1] It is a prime wireless spectrum band that is currently being used by wireless carriers in the national provision of

---

[1] The EBS was previously known as the Instructional Television Fixed Service, which was designed as a cost-effective vehicle for educational institutions to deliver pre-recorded instruction by television. ITFS was a band of microwave television channels available to be licensed by the FCC to educational institutions, which in turn could lease a portion of their excess capacity spectrum for commercial use.

2

advanced wireless services, including mobile broadband services. Since January 10, 2005, the FCC's rules allow holders of EBS spectrum to lease their licenses to third-party wireless carriers for 30-year terms.  As of April 27, 2020, the FCC began allowing EBS license holders like Assumption High School and its school board to sell their licenses to commercial for-profit entities; such sales were previously restricted to non-commercial nonprofit entities.

An EBS license authorizes a licensee to utilize a 22.5 megahertz wide allocation of spectrum at frequencies within the range of 2496-2690 MHz.  Depending on the terms of their licenses and applicable FCC rules, EBS licensees may enter into spectrum leases with third parties, authorizing a third-party lessee to use a portion or all of the EBS license holder's spectrum for commercial purposes.  EBS licensees may now sell their licenses to commercial entities.

The FCC issued EBS channels C1 through C4 to Assumption Parish High School to transmit in the Assumption Parish, Louisiana area. Since December 21, 2007, Utopian Wireless Corporation leases the Channels from Assumption High pursuant to the parties' Educational Broadband Service Lease Agreement.

According to the complaint's allegations, and pursuant to Section 2 of the Lease Agreement, Assumption High and Utopian are

3

in their first of three 10-year terms of the lease. Section 3 obliged Utopian to pay $75,000 in an initial fee payment and $4,000 each year for use of the Channels during the initial 10-year term and then $5,000 each year during the second 10-year term. Section 10.1 of the Lease obliges the parties to cooperate in executing and filing the necessary FCC forms required to effectuate the Lease terms, including filing a long-term lease application with the FCC on Form 608, which the FCC requires to authorize the long-term lease. This cooperation has not been forthcoming.

Prior to terminating the lease for any material breach, Section 12.2 of the Lease requires that the non-defaulting party give to the defaulting party 30 days' prior notice of a material breach and an opportunity to cure the alleged breach. The written notice must be sent by a "reliable national express overnight delivery service" to comply with Section 19 of the Lease.

By Section 16, Assumption High agreed to "use it best efforts to obtain and maintain all licenses, permits and authorizations required or desired by [Utopian] for the use of the Channels, and will remain eligible under the FCC Rules to provide the Lessee Capacity." Assumption High also agreed to "take all necessary steps to renew the License, as required" and agreed that it "will not commit any act, engage in any activity, or fail to take any

4

action that could reasonably be expected to cause the FCC to impair, revoke, cancel, suspend or refuse to renew the License."

If Assumption High fails to perform its duties under the Lease, Section 20.2 permits Utopian to seek, among other things, injunctive relief and specific performance. In any action "on account of any breach of or to enforce or interpret any of the terms, covenants or conditions of" the Lease, Section 20.3 entitles the prevailing party to reasonable attorneys' fees and costs.

In March 2008, Assumption High consented to the filing of FCC Form 608 for the long-term lease application. Utopian advised Assumption High that, upon the FCC's grant of that application by final order, it would commence the lease payments. But the long-term lease application was never filed.

Over three years later in October 2011, Assumption High's EBS license began operating on equipment provided by Utopian in the licensed service area. On October 28, 2011, Assumption High and Utopian cooperated in filing FCC Form 605 for Substantial Service, which notified the FCC that Assumption High's EBS license was operating in compliance with the FCC's substantial service requirements. The FCC required a licensee to file Form 605 in order to certify its license was operating.

In April 2013, Assumption High fulfilled the FCC regulatory requirement in filing a renewal for its license, WLX844. As far

5

as Utopian knows, Assumption High's EBS license has been in continuous operation through the current date on equipment provided by Utopian and located in the licensed service area.

In October 2020, Utopian sent Assumption High an annual fee payment of $4,000, notwithstanding that the FCC Form 608 long-term lease application was never filed. Utopian attempted to contact Assumption High representatives to seek consent to the filing of the long-term lease application. To no avail. In December 2020, Utopian contacted Assumption High asking for its consent to file the long-term lease application, FCC Form 608, in accordance with Section 10.1 of the Lease. Assumption High ignored Utopian. To date, Assumption High has refused to file the long-term lease application with the FCC.

On January 22, 2021, Utopian mailed Assumption High a formal notice and demand letter pursuant to Lease Sections 10.1 and 20.2. Utopian demanded that Assumption High file the required Form 608 long-term lease application or that it consent to Utopian filing the long-term lease application on behalf of Assumption High. Though the letter requested that Assumption High respond within five days, no response was received. Despite multiple requests by Utopian, Assumption High has not filed the FCC form 608 for application of a long-term lease application.

On March 3, 2021, Utopian Wireless Corporation sued Assumption High School and Assumption Parish School Board, invoking the Court's diversity jurisdiction and seeking a declaratory judgment (that the Lease is in full force and effect and any termination of the Lease by Assumption High is invalid) and -- due to Assumption High's alleged breach of the Lease -- damages, attorney's fees and costs, as well as specific performance of the parties' EBS Lease Agreement.  Utopian Wireless, a Delaware corporation with its principal place of business in Washington D.C., alleges that the defendants are Louisiana citizens and that "the value of the leasehold interest that Utopian seeks to protect exceeds $75,000.00."[2]  "A prime spectrum license is a valuable commodity," it is alleged.  Challenging the plaintiff's allegation that the amount in controversy exceeds $75,000, the defendants now move to dismiss Utopian's complaint for lack of subject matter jurisdiction.  In the alternative, advancing affirmative defenses to Utopian's claims, the defendants move to dismiss for failure to state a claim.

---

[2] The plaintiff explains:
> Educational broadband service spectrum licenses ... are prime/valuable spectrum licenses as they are frequently used by national wireless carriers.  This particular leasehold interest is valuable because of the term remaining on the lease and its status as an educational broadband service spectrum license.

I.

*A.*

The subject matter jurisdiction of federal courts is limited. Kokkonen v. Guardina Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Indeed, "[i]t is to be presumed that a cause lies outside this limited jurisdiction," the Supreme Court has observed, "and the burden of establishing the contrary rests upon the party asserting jurisdiction." Id. (citations omitted); St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288 (1938)("[t]he intent of Congress drastically to restrict federal jurisdiction in controversies between citizens of different states has always been rigorously enforced by the courts."); King v. U.S. Dep't of Veterans Affairs, 728 F.3d 410, 416 (5th Cir. 2013); Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001).

Rule 12(b)(1) requires dismissal of an action if the Court lacks jurisdiction over the subject matter of the plaintiff's claim. There are two types of Rule 12(b)(1) motions: "facial attack" and a "factual attack" on a complaint under Rule 12(b)(1). See Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981). If the defendants present a "facial attack" under Rule 12(b)(1), the Court need only look to the sufficiency of the allegations in the complaint, presumed to be true. If, on the other hand, the defendants advance a "factual attack" on the Court's subject matter jurisdiction, both sides may submit evidence to consider. Thus,

8

the Court may find a plausible set of facts to support subject matter jurisdiction by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996).

To carry its burden to prove that the Court has diversity jurisdiction, Utopian, the party invoking the Court's jurisdiction, must show by a preponderance of the evidence that (1) complete diversity of citizenship between the parties; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.  Garcia v. Koch Oil Co. of Texas Inc., 351 F.3d 636, 638 (5th Cir. 2003)(citing 28 U.S.C. § 1332).  "[U]nless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." Id. (quoting St. Paul Mercury Indemnity, 303 U.S. at 288).  Dismissal is justified only if it appears "to a legal certainty that the claim is really for less than the jurisdictional amount."  St. Paul Reinsurance Co., Ltd. v. Greenberg, 134 F.3d 1250, 1253 (5th Cir. 1998)(quoting St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938)).

*B.*

Seeking dismissal under Rule 12(b)(1), the defendants challenge only the amount-in-controversy requirement. But they neither claim bad faith nor submit evidence supporting their theory that the value of any lease to Utopian is less than $75,000.

Looking to the complaint, the plaintiff alleges that "the value of the leasehold interest that Utopian seeks to protect exceeds $75,000.00"; that EBS spectrum licenses are valuable given their frequent use by national wireless carriers; and that "[t]his particular leasehold interest is valuable because of the term remaining on the lease and its status as an educational broadband service spectrum license." There is no reason to believe that Utopian has asserted these allegations in bad faith.

Rather than suggesting that Utopian's allegation concerning jurisdictional amount in controversy was asserted in bad faith, the defendants conclude that Utopian has no plausible claim against them and, therefore, the amount in controversy cannot exceed $75,000. Alternatively, the defendants suggest that, if the Lease Agreement's $4,000 annual fee is the proper measure of the amount in controversy, then the plaintiff falls short of establishing that the amount in controversy exceeds $75,000. But the defendants' myopic and unsupported valuation ignores that the plaintiff's allegation that the amount in controversy exceeds

10

$75,000. This allegation controls here, absent evidence indicating to a legal certainty that the plaintiff's claim is really for less than the jurisdictional amount alleged.

The defendants offer no support for their conclusion that the plaintiff's claim places at controversy less than $75,000. What's more, the plaintiff offers *uncontroverted* evidence to support its controlling allegation that the amount in controversy exceeds $75,000. Utopian's CEO declares under penalty of perjury this support for the complaint's allegations that a prime spectrum lease like the one in this lawsuit is "a valuable commodity":

- Based on my experience in the broadband spectrum industry, which includes the purchase and sale/assignment of leases like the one between Utopian and Assumption High School, the value of leasehold interest in the Lease, based on the remaining term, is well above $75,000.
- If Utopian were to sublease its interest in the Lease to a national wireless carrier, such as T-Mobile, Utopian would receive substantially more than $300,000 based on the term remaining under the Lease, including all extensions.

In the face of this evidence, the defendants are silent. Nor do they respond to the plaintiff's supplemental paper in which Utopian submits additional evidence indicating that the defendants potentially could sell their license for millions of dollars.

11

According to an email from an attorney and EBS license broker, the broker estimates that the defendants' *license* could be sold for more than $4.5 million. True, this full value of the defendants' license could not be realized by Utopian, the mere lessee of the license; however, because Utopian alleges (and the Lease Agreement suggests) that -- as lessee of a multimillion dollar license interest -- it could sell or assign its interest in the long-term lease,[3] which is the object of this litigation, it follows that its assignable leasehold interest has value exceeding $75,000.[4] Indeed, it offers evidence to support a sublease valuation of

---

[3] The Lease Agreement purports to limit only the lessor's (Assumption's) assignment and transfer rights at Section 11; that is, Assumption must obtain Utopian's written consent before assigning or transferring its rights or obligations. Assignments and transfers are contingent on eligibility under FCC Rules, per Sections 15.6, 15.7.

[4] To be sure, any attempt to precisely estimate the value of the license, let alone the value of its lease *to Utopian* is tricky, at best. See generally, e.g., In re Fort Wayne Telsat, Inc., 665 F.3d 816, 818-820 (7th Cir. 2011)(observing that EBS "leases have become much more valuable than they were" in 1994; noting that the value of a lease of some portion of broadcasting rights from an EBS license would be an asset to the debtor, but estimating the value that the license would have to the debtor was difficult to estimate and would be considerably less than the value of the license (some $4.1 million), considering the regulatory hoops the debtor would first have to jump through to realize some value; noting that the trustee's estimate of the license's value to the debtor, $600,000, was "reasonable" but that the debtor prudently settled its claim against the university license holder for $100,000); In re Fort Wayne Telsat, Inc., 489 B.R. 773, 786 (Bankr. N.D. Ind. 2010)("All parties agree that it is extremely difficult to determine the value of an FCC license absent an actual transaction in which the rights to the license have been valued.").

$300,000. This information supports Utopian's allegation that the amount in controversy exceeds $75,000.

In sum, Utopian satisfied its pleading obligation when it alleged in good faith that the value of its leasehold interest exceeds $75,000. The entire value of Utopian's interest, the plaintiff suggests, includes the market value of the leasehold interest if Utopian were to sublease its interest to a wireless carrier like T-Mobile. The defendants offer no response to this submission except to suggest that Utopian has at best a speculative interest that cannot be valued. But the plaintiff's allegation that the amount in controversy exceeds $75,000 controls where, as here, the defendants do not suggest that it was advanced in bad faith. Nor have the defendants submitted any evidence to indicate to a legal certainty that the amount in controversy is less than the plaintiff has alleged. In fact, the only evidence offered indicates that an estimated value of the license is several million dollars, which supports Utopian's allegation that its leasehold interest exceeds $75,000.[5] The Court has subject matter jurisdiction based on diversity.

---

[5] That the Lease itself requires payments by Utopian to the defendants exceeding $75,000 does not, as the defendants submit, undermine the finding that the $75,000 amount in controversy requirement is met. Utopian seeks specific performance of the Lease Agreement, which calls for an initial fee of $75,000 followed by a $4,000 payment and then increasing annual renewal payments. It would seem, then, fees paid and due are fairly in controversy.

13

II.

*A.*

In addition to the jurisdictional challenge, the defendants also seek dismissal of the plaintiff's claims, purportedly for failure to state a plausible claim under Rule 12(b)(6). The standard of review applicable to motions to dismiss under Rule 12(b)(1) resembles that applicable to motions to dismiss under Rule 12(b)(6). See Williams v. Wynne, 533 F.3d 360, 364-65 n.2 (5th Cir. 2008)(observing that the Rule 12(b)(1) and Rule 12(b)(6) standards are similar, but noting that applying the Rule 12(b)(1) standard permits the Court to consider a broader range of materials in resolving the motion).

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Such a motion is rarely granted because it is viewed with disfavor. See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim

---

Indeed, in the Rule 12(b)(6) portion of their motion, the defendants submit that the principal and interest due under the Lease is over $200,000, not the $4,000 paid in October 2020.

14

showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed. R. Civ. P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014) (citing Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 854 (5th Cir. 2012)(en banc)). But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true. Id. at 502-03 (citing Iqbal, 556 U.S. at 678).

To survive dismissal, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations and footnote omitted). "A claim has facial plausibility when the

15

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

Finally, "[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011)(quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)). A contract, such as the parties' Lease,

may be considered part of the pleadings because it is referenced in the complaint and central to the plaintiff's claims. See Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004)(citation omitted). If the Court considers materials outside of the pleadings, the motion to dismiss must be treated as a motion for summary judgment under Rule 56. See id.; see also Fed. R. Civ. P. 12(d).

*B.*

Seeking dismissal for failure to state a claim, the defendants first suggest that specific performance is precluded against a state agency; that the rules governing the issuance of a writ of mandamus instead would apply. As for the breach of contract claim, the defendants say it must be dismissed because Utopian failed to make any payment for 13 years and that its attempt to cure its own breach was meager (a $4,000 payment) ... and 13 years late.[6] Third and finally, the defendants advance defenses of laches and unclean hands, arguing that, under Delaware law, a breach of contract claim is time-barred after three years and Utopian, as the breaching party, failed to make payments for 13 years.

The plaintiff counters that the contract between the parties, the Lease Agreement, gives rise to its cause of action and, thus,

---

[6] The defendants submit that the principal and interest due under the Lease is over $200,000, not the $4,000 paid in October 2020.

17

it states a plausible claim. Contrary to the defendants' argument, specific performance is the appropriate remedy to enforce a school board's breach of contract[7] and the parties agreed to injunctive relief and specific performance as a remedy in the Lease Agreement. Therefore, Utopian contends that it has stated a cause of action for specific performance for breach of contract. Insofar as the defendants argue that Utopian has failed to cure its breach of the parties' agreement, this is a defense or counterclaim, and it is inappropriate at the dismissal stage to evaluate the plaintiff's likelihood of success. Here, Utopian alleges that the defendants have ignored Utopian's fee payment and requests to file FCC Form 608 because they consider the lease terminated. But it is Utopian which alleges that it is the only party who has properly mailed a formal default notice consistent with the parties' agreement. The defendants' defense of laches, the plaintiff argues, is just that: a defense, which must be affirmatively pled in the defendants' answer. Utopian alleges that it requested that the defendants file the FCC Form 608 in October 2020 and filed suit in March 2021 after the defendants ignored Utopian's requests. Whether

---

[7] This is established by the very case invoked by the defendants to suggest the opposite. See Charter School of Pine Grove v. St. Helena Parish School Board, 9 So. 3d 209, 225 (La. App. 1 Cir. 2/19/09)("We have concluded that Pine Grove is entitled to specific performance of the Charter School Agreement.").

18

additional facts will be pled or proved by the defendants to support their laches defense must wait. The Court agrees.

Where, as here, the defendants do not challenge the technical sufficiency or plausibility of Utopian's allegations, Rule 12(b)(6) relief is not available. The defendants focus not on whether the plaintiff has alleged facts that, if proved, could satisfy the elements applicable to the plaintiff's claims;[8] rather, the defendants telegraph affirmative defenses they will advance. Any ruling on the merits of the defendants' future defenses is premature.

Accordingly, for the foregoing reasons, IT IS ORDERED that the defendants' motion to dismiss is DENIED.

New Orleans, Louisiana, May 25, 2021

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[8] Indeed, the defendants do not brief the elements of the law application to the plaintiff's claims.